Filed 1/27/22  In re P.K. CA4/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

# FOURTH APPELLATE DISTRICT

# DIVISION TWO

| | |
|---|---|
| In re P.K., a Person Coming Under the Juvenile Court Law. | |
| SAN BERNARDINO COUNTY CHILDREN AND FAMILY SERVICES, | E077429 |
| Plaintiff and Respondent, | (Super.Ct.No. J283352) |
| v. | OPINION |
| H.A., | |
| Defendant and Appellant. | |

APPEAL from the Superior Court of San Bernardino County.  Annemarie G. Pace, Judge.  Affirmed in part; reversed in part.

Rich Pfeiffer, under appointment by the Court of Appeal, for Defendant and Appellant.

Steven O'Neill, Interim County Counsel, David Guardado, Deputy County Counsel, for Plaintiff and Respondent.

1

Mother appeals the order of the San Bernardino County juvenile court terminating her parental rights as to her daughter, P.K., pursuant to section 366.26 of the Welfare and Institutions Code.[1]

On appeal, mother argues reversal of the order terminating parental rights is called for each of several reasons: (i) the court erred when it denied mother's request for a bonding study; (ii) the court failed to adequately address sibling visitation; (iii) P.K.'s siblings were not given adequate notice of the permanent plan selection hearing; (iv) minor's counsel had an impermissible conflict of interest, and (v) the San Bernardino County Children and Family Services (the Department) investigation of P.K.'s potential Indian ancestry was inadequate. We will reject the first four of mother's contentions and deny her motion made pursuant to Code of Civil Procedure section 909 seeking our consideration of postjudgment evidence offered in an effort to support her sibling visitation and conflict of interest claims. As to her fifth argument, we will conditionally reverse and remand for compliance with the Indian Child Welfare Act (ICWA or the Act) and California's ICWA-implementing statutes and rules.

## BACKGROUND

Mother has four children: A.K., born in December 2011; M.K., born in April 2013; P.K., born in September 2016; and, E.S., born in May 2018. The presumed father of the three older children is S.K. (father), and E.S.'s presumed father is T.S. P.K. is the subject of this appeal.

_____

[1] All further statutory references are to the Welfare and Institutions Code unless otherwise noted, and references to rules are to California Rules of Court.

The circumstances resulting in termination of mother's parental rights as to P.K. began to unfold when, in 2014, her siblings M.K. and A.K. (the older siblings) were declared dependents of the court and removed from the home pursuant to section 300 due to their parents' mental illness and domestic violence issues. Family reunification services were ordered for mother but not offered to father pursuant to section 361.5, subdivision (e)(1), which authorizes the court to bypass services for an incarcerated parent if it determines by clear and convincing evidence that offering services would be detrimental to the child. In 2016, when mother failed to reunify with the older siblings, they were placed in a legal guardianship with their maternal grandmother. Father was not permitted to contact or visit the children.

P.K. was born in 2016 and, twenty months later, E.S. arrived. The two children were with mother in the home of the maternal grandmother along with the older siblings in November 2019, when father hit mother in the face in the children's presence. P.K. and the older siblings were taken into protective custody by respondent the Department and placed in foster homes. E.S. was placed with her father. The Department filed section 300 juvenile dependency petitions on behalf of P.K. and E.S, and section 387 supplemental dependency petitions as to the older siblings.

In the course of the January 2020 hearings on jurisdiction and disposition, the juvenile court sustained the petitions as to all four children and adjudged P.K. and E.S. dependents of the court. E.S. was continued in placement with her father. The court ordered the older siblings removed from the maternal grandmother's care with provision

3

of family reunification services. As to P.K., the court ordered removal from her parents and bypassed services for mother because she had failed to reunify with the older siblings in the previous dependency proceedings. It ordered services be provided for father because none had been offered him in the prior case, but found it would be detrimental to permit him to visit P.K. Although the reporter's transcript does not reflect a dispositional order for mother to visit P.K., the minutes provide for weekly supervised two-hour visits, and the record reflects those visits took place.

P.K. and the older siblings were continued in foster care and placed together not long after the hearing on jurisdiction and disposition.

At the July 2020 six-month status review hearing, the court dismissed E.S.'s dependency and awarded sole legal, physical custody to her father. It returned the older siblings to the maternal grandmother with family maintenance services. Minors' counsel recommended P.K.'s placement with a maternal aunt and opposed the maternal grandmother's request to place the child with her. The court authorized placement with the aunt and ordered visits between P.K. and her older siblings. Father's reunification services were continued for an additional six months.

The twelve-month review hearing was held in January 2021. Mother did not attend but had given her counsel permission to proceed in her absence. The court terminated reunification efforts for father and set P.K.'s matter for a section 366.26 permanent plan selection hearing to take place on May 24. It dismissed the dependency proceedings of the older siblings and, although not appearing in the minute order, it

4

ordered P.K. be provided visits with them. P.K.'s supervised visits with mother were reduced to a minimum of once a month and the court did not order visits with father.

In response to maternal grandmother's counsel's remark that his client would like to petition the court to keep all three girls together in her home, the court stated P.K. was in a prospective adoptive home of a relative, so there was no need for a change in placement. The court noted that she could ask to be assessed as a backup placement. There is no indication in the record to suggest maternal grandmother requested an assessment.

Eighteen days before the section 366.26 hearing, mother filed a motion requesting the appointment of an expert evaluator to prepare a bonding study. The court denied it without comment.

Mother and father were not present when the hearing went forward on May 24, 2021. Mother's counsel informed the court his client had assured him she would be there, and both he and father's counsel asked the court to "set" the matter. The court denied the requests as not being in P.K.'s best interests. It received into evidence the report prepared by the Department in anticipation of the hearing and found P.K. adoptable by clear and convincing evidence. Counsel for each of the parents entered an objection to termination of parental rights and expressed the opinion that P.K. had a bond with the older siblings that should not be severed. The court found the parents had not been acting in a parental role in almost more than half of P.K.'s life and expressed agreement with the comment of minor's counsel that the plan was for P.K. to be adopted

by her maternal aunt so the bond with her siblings would not be disrupted by severing her parents' right. It proceeded to terminate parental rights. Mother appealed.

## DISCUSSION

1. *The denial of mother's request for a bonding study*

On May 6, 2021, less than three weeks before the date set for the permanent plan selection hearing, mother filed a motion for a bonding study pursuant to Evidence Code section 730. In her moving papers, mother explained she needed the study to assist her in "establishing the evidence regarding the nature and quality of her relationship with [P.K.]." The motion recited facts mother posited could be gleaned from her visits with P.K. and which she opined would demonstrate the applicability of the beneficial parent-child relationship exception to termination of parental rights set forth in in section 366.26, subdivision (c)(1)(B)(i). The court summarily denied the request.

On appeal, mother argues the denial violated her right to due process because the lack of a bonding study prevented her from establishing the applicability of the beneficial parent-child relationship.

Along the way and in disregard of rule 8.204(a)(1)(B), which requires each point to be stated under a separate heading or subheading, she also claims the court's denial of the request caused her to be unable to establish the exception to termination of parental rights based upon substantial interference with P.K.'s relationships with her siblings as described in subdivision (c)(1)(B)(v) of section 366.26. In addition, she complains the denial left the court without what she describes as essential information concerning

6

P.K.'s anxiety disorder, post-traumatic stress disorder, and attention deficit hyperactive disorder, conditions the Department had reported to the court. Mother did not include in her motion her desire to develop those issues and we will not consider them on appeal in keeping with the well-settled principle that contentions not raised in the trial court will not be considered on appeal, a principle founded on considerations of fairness to the court and opposing party, and on the practical need for an orderly and efficient administration of the law. (*People v. Gibson* (1994) 27 Cal.App.4th 1466, 1468.)

a. *The appropriate standard of review is abuse of discretion*

The juvenile court's denial of a bonding study is reviewed for an abuse of discretion. (*In re Lorenzo C.* (1997) 54 Cal.App.4th 1330, 1339 (*Lorenzo C.*).) Mother argues, however, that we should employ a de novo standard of review because the proceedings were rendered fundamentally unfair by the denial. She posits she was unable to avoid termination of parental rights because, without the bonding study, it was impossible for her to establish "just how beneficial her relationship with [P.K.] is."

That claim is bottomed on the theory there is no other method besides a bonding study to establish the relationship because the only other possible evidence on the subject was the Department's "inaccurate" report or reports, which say only the visits were appropriate and consistent but do not state "how well the visits went." Mother does not include citations to the record where the reports she complains of can be found as required by rule 8.204(a)(1)(c).

7

Mother's fundamental unfairness claim lacks merit.  The denial of a bonding study did not deprive her of a full and fair opportunity to take issue with the Department's reports or to develop evidence in support of an argument that the beneficial parent-child relationship exception to termination of parental rights should be applied in P.K.'s case. She had the right to complain about any inadequacies in the Department's reports at every stage of the proceedings, including at the section 366.26 hearing, but did not do so. (*In re Dakota S.* (2000) 85 Cal.App.4th 494, 501-502.)  At the section 366.26 hearing, she had a due process right to cross-examine and controvert any contents of the Department's report that were relevant to the issues before the court at the hearing, but did not do so.  (*In re Thomas R.* (2006) 145 Cal.App.4th 726, 733.)  And, she had the right to make an offer of proof and request a contested hearing on the issues whether P.K.'s relationship with her called for application of the parent-child exception to termination of parental rights, but she did not do so.  (*In re Grace P.* (2017) 8 Cal.App.5th 605, 611-612 (*Grace P.*).)

In short, mother is not entitled to de novo review of the court's denial of a bonding study because she had full and fair opportunities to develop evidence relevant to the issue of the beneficial relationship exception.

> b.  *The juvenile court's denial of the request for a bonding study was not an abuse of discretion*

Having rejected mother's suggestion we review the denial of the bonding study de novo, we now review the court's decision using the abuse of discretion standard.

(*Lorenzo C., supra,* 54 Cal.App.4th at p. 1341.) We will not disturb the ruling unless we find the court exceeded the limits of discretion by making an arbitrary, capricious, or patently absurd determination. (*In re Aaron R.* (2005) 130 Cal.App.4th 697, 705-706.)

Evidence Code section 730 authorizes the juvenile court to appoint an expert for a bonding study when it appears to the court that such a study is or may be required by the court or by any party as to a fact or matter to which expert evidence is or may be required. It is well settled that a bonding study is not a prerequisite for an order terminating parental rights. (*Lorenzo C., supra,* 54 Cal.App.4th at p. 1339.)

If a parent wants a bonding study to assist in establishing the parent-child exception to termination of parental rights, the request should be made before the end of reunification efforts to avoid causing any delay in the selection of a permanent plan for the child. (*In re Richard C.* (1998) 68 Cal.App.4th 1191, 1197 (*Richard C.*).) And, although it is not beyond the court's discretion to grant the request while the permanent plan selection hearing is pending in the presence of compelling circumstances, a decision to deny it is fully within the bounds of reason and is consistent with due process and with the Legislature's intent to avoid unnecessary delay in selecting a permanent plan. (*Ibid.*)

Here, mother filed her motion seeking a bonding study nearly five months after the court had set the date for the permanent plan selection hearing. In her moving papers, mother acknowledged her request was made late in the process, but stated her need to establish her interactions with P.K. during visits as evidence of the quality and nature of their relationship was an "extremely compelling reason[]" to grant the motion.

9

Appointing a bonding expert would not have provided mother with the evidence she was seeking to establish because the only persons present during visits were mother, P.K., the older siblings, and the visit monitor. As noted, *ante,* mother could have requested a contested hearing upon making an offer of proof, and provide her own testimony and called others to testify on the interactions during visits. (*Grace P., supra,* 8 Cal.App.5th at pp. 611-615.) Moreover, when mother filed her motion, the hearing was eleven business days away, leaving precious little time to consider the request and appoint an expert, who would then need to schedule and conduct interviews, prepare a report, and make arrangements to testify at the hearing. Under the circumstances, the court did not abuse its discretion when it denied the request. (*Richard C., supra,* 68 Cal.App.4th 1191.)

Mother points to her "declaration" attached to the motion and claims the document should have provided sufficient uncontroverted evidence of an emotional and parental bond in need of preservation. She appears to suggest the document should have provided sufficient fodder not only to justify appointment of an expert but also for the court to conclude termination of parental rights would be detrimental to P.K. Whatever its intended purpose, the declaration is useless because it is not signed by mother and bears a date that seems to be in her counsel's handwriting. As such, the document does not satisfy rule 8.54(a)(2), which requires a motion based on matters outside of the record be supported by a declaration. Whenever a rule requires any matter required to be

established by a declaration, the declaration must be dated and executed by the declarant. (Code of Civ. Proc., § 2015.5.)

2. *Mother's claims regarding sibling visitation and placement*

Under the heading, "The Court Erred in Not Adequately Addressing Sibling Visitation," mother claims the court was required to place P.K. with her older siblings and suggests that placement should have been in the maternal grandmother's home. Based on that premise, she requests this court remand this case with instructions to the juvenile court to appoint independent counsel for the older siblings and another counsel for P.K., and to then make a determination whether the three siblings should be placed together. Mother's arguments are not cognizable on this appeal. As explained *post*, mother lacks standing to raise issues regarding P.K.'s placement and visits, and in all events the issues she raises have either been forfeited, have not yet arisen, or are not applicable when the juvenile court terminates parental rights.

a. *Mother does not have standing to raise placement and visitation issues*

Standing to appeal requires a party to be aggrieved by an appealable order, that is, the party's rights or interests must be injuriously affected by the decision in an immediate and substantial way, and not as a nominal or remote consequence of the decision. (*In re K.C.* (2011) 52 Cal.4th 231, 236 (*K.C.*).) In an appeal from an order terminating parental rights, a parent has standing to raise issues of a child's placement in an appeal from an order terminating parental rights only if reversal of the placement orders would advance the parent's challenge to the terminating order. (*Id.,* at pp. 237-238.) In other words, a

11

parent who did not attempt to establish an exception to termination of parental rights in the juvenile court has relinquished the only interest in the child that would render the parent aggrieved by a juvenile court's pre-termination placement order. (*Id.,* at p. 238.)

Here, mother's counsel objected to the termination of parental rights and joined the remark of father's counsel that she "would . . . assert that there's a sibling bond between [P.K.] and her older sisters that I do not think should be severed." But, neither he nor father's counsel made an offer of proof or otherwise pointed to any evidence to suggest the sibling relationship or any other exception to termination of parental rights might be applicable. Because of the absence of an effort to establish the elements of an exception by a preponderance of evidence, mother is not able to demonstrate that remand of this matter for a determination whether P.K. and her older siblings should be placed together would affect P.K.'s permanent plan such that her parental rights would be reinstated. (Rule 5.575; *In re Rachel M.* (2003) 113 Cal.App.4th 1289, 1295.) Accordingly, she lacks standing to raise issues concerning P.K.'s placement or visitation orders.

> b. *Even if mother had standing, she would not prevail on her claims regarding sibling visitation and Mother's section 361.3 relative placement preference claim*

Section 361.3 requires the juvenile court to give preferential consideration of a relative's request for placement of a child removed from the physical custody of the parents. At bottom, mother's complaint, raised for the first time in this appeal, is the

court chose the wrong relative, that it should have honored the maternal grandmother's request for placement instead of the maternal aunt's because the older siblings live with the maternal grandmother under a plan of legal guardianship.

In the course of the July 2020 six-month review hearing, the juvenile court returned the older siblings to the maternal grandmother and, contrary to the wishes of the maternal grandmother, authorized P.K.'s placement with the maternal aunt. Mother did not object and, in all events, the time for appealing those orders has long since expired. (§ 395; rules 5.585, 8.104.) At the 12-month review hearing during which the court set P.K.'s case for a permanent plan selection hearing, the maternal grandmother again asked for P.K. to be placed with her. The court denied the request, noting P.K. was in the home of a relative who was also a prospective adoptive placement. Mother did not object and did not file an extraordinary writ seeking to challenge any of the orders made at the hearing. (§ 366.26, subd. (l) [orders made at hearing setting are not appealable unless specific issue raised in a timely petition for extraordinary relief and the reviewing court did not decide the writ petition on its merits].)

c.  *Mother's claims of violations of section 16002*

Mother complains it appears efforts were not made by the Department, the court, or minors' counsel to place the children together even though section 16002 reflects the Legislature's goal to place siblings in the same foster care placement and to provide for visits when separated. (§ 16002, subds. (a), (b).) The argument fails for each of two reasons. First, P.K. was placed in the same foster care home as the older siblings and,

13

when the siblings were returned to the maternal grandmother, visits were provided. Second, she has forfeited her right to challenge any of the court's placement and visitation orders by her failure to object and failure to take a timely appeal from them. (§ 395; rules 5.585, 8.104; *In re Anthony P.* (1995) 39 Cal.App.4th 635, 640-642 (*Anthony P.*).)

She also notes that, after parental rights are terminated and the court orders the child placed for adoption, the Department is required by subdivision (e) of section 16002 to take steps to facilitate ongoing sibling contact unless the court finds those steps are contrary to the safety or well-being of the child. To the extent mother is suggesting the court had a duty at the permanent plan selection hearing to include an order directing the Department to take those steps, she did not call that omission to the court's attention and has, therefore, forfeited her claim. (*Anthony P., supra,* 39 Cal.App.4th at pp. 640-642.) To the extent she is complaining the Department has not taken those steps since parental rights were terminated, the issue is not encompassed by this appeal and, in all events, the obligations imposed by subdivision (e) arise after parental rights have been terminated, and that order is not yet final.

> d. *Mother's mistaken suggestion that juvenile court should have issued "exit orders" ensuring visits*

Mother cites *In re T.H.* (2010) 190 Cal.App.4th 1119 and *In re John W.* (1996) 41 Cal.App.4th 961, and suggests the juvenile court should have made exit orders because there "was a strong indication that frequent visitation was in [P.K.]'s best interest." As

14

those cases make clear, exit orders would never be a consideration in permanent plan selection proceedings. An exit order is issued pursuant to section 362.4 when the dependency is terminated because the parents no longer pose a danger to the child. (§ 362.4; *In re T.H., supra,* 190 Cal.App.4th at pp. 1121, 1123; *In re John W., supra,* 41 Cal.App.4th at pp. 964-965.) Those orders set forth the parents' respective rights to custody of and visits with the child, which are then filed in the family court. (*Ibid.*)

     3. *Mother's claim of inadequate notices to P.K.'s siblings*

Mother argues the Department failed to give proper notice of the permanent plan selection hearing to P.K.'s siblings. She claims the lack of notice caused the older siblings to be deprived of the opportunity to give critical information to the juvenile court with respect to the sibling and beneficial parent-child relationship exceptions to termination of parental rights and prevented the juvenile court from determining whether E.S.'s best interests would be served by maintaining a relationship with her siblings.

     a. *Mother does not have standing to raise notice issues*

As explained *ante* in connection with mother's claim that the court failed to adequately address visitation and placement, mother has standing to challenge only those juvenile court errors that would advance her challenge to the terminating order if she prevailed. (*K.C., supra,* 52 Cal.4th at pp. 237-238.) She did not undertake to establish an exception to termination of parental rights in the juvenile court. As a result, she has no standing to complain that any defect in the notice to P.K.'s siblings and their caretakers deprived her of the ability to present critical information regarding the sibling and

15

beneficial relationship exceptions to termination because her rights and interests were not affected in an immediate and substantial way. (*Id.,* at p. 238.) Moreover, even if mother had standing, we find no defect in the notices to the older siblings and we find mother was not harmed by the failure to send notice to E.S.'s father.

b. *The Department's compliance with the notice requirement*

Section 294 requires notice of a section 366.26 permanent plan selection hearing be given to any known sibling of the child who is the subject of the hearing. (§ 294, subd. (a)(6).) If the sibling is under ten years of age, the Department is to give notice to the sibling's caretaker and the sibling's attorney. (*Ibid.*) Here, P.K.'s eldest sibling, A.K., was born in December 2021. She was, therefore, only nine years old on March 30, 2021, when the Department served notice on her and her younger siblings.

According to the proof of service executed under penalty of perjury by an employee of the Department, the older siblings were properly served by sending the notice by first class mail to their caretaker (the maternal grandmother) and by service on counsel for the minors by deposit of the notice in the "Attorney Bin" at the court.

Although minors' counsel was given notice with respect to all the older siblings and E.S., the proof of service of the notice does not reflect service on E.S.'s father. Mother does not claim her interests were adversely affected by E.S. not appearing at the hearing.

16

c. *Mother's claims with respect to sufficiency of the notices to siblings*

Mother posits the failure to provide notice to E.S. deprived the juvenile court of critical information needed to determine that child's best interest in maintaining a relationship with her siblings. Of course, only P.K.'s interests were before the court at the section 366.26 hearing. (*In re Celine R.* (2003) 31 Cal.4th 45, 54 [when considering sibling relationships, the juvenile court's focus is on the impact on the child being considered for adoption, not that child's sibling or anyone else].)

Mother claims, "[n]o attempt was made to notice any of the siblings or their respective caretakers of [P.K.]'s scheduled section 366.26 hearing." That statement is patently incorrect. The certificate of service reflects notice was properly served on the maternal grandmother (B.C., the legal guardian of the older siblings) and minors' counsel. There is no evidence to support mother's assertion that the maternal grandmother did not receive the notice properly addressed to her (which is the same address used to serve mother). We give no credence to mother's unwarranted remark made in connection with her no-notice claim that, "[i]t was harmless error [*sic*] to notice [P.K.]'s attorney because he had demonstrated he could care less about the sibling relationships . . . ." Service on counsel was appropriate and in keeping with the requirements set forth in subdivision (a)(6) of section 294 for service on siblings under the age of 10.

The remainder of mother's no-notice arguments are devoted to: (i) rehashing complaints made earlier in her brief about the court's handling of placement and

visitation issues, (ii) arguing how the lack of notice deprived the siblings of their right to present evidence at the section 366.26 hearing "to provide a more balanced view of what was in [P.K.]'s best interests," and (iii) alluding to her theory that, but for the incompetence of minors' counsel and his conflict of interest arising from having represented all the children, the outcome of this dependency would have been different. We have already disposed of the first two subjects of complaint, and now turn to mother's arguments concerning P.K.'s counsel.

4. *Mother's claim that minors' counsel had an impermissible conflict of interest*

One attorney represented P.K., her older siblings, and E.S. in their respective dependency proceedings. Mother argues that arrangement gave rise to an impermissible conflict of interest calling for reversal of the order terminating parental rights because counsel advocated for P.K. to be adopted without ensuring sibling visitation would continue with his other clients.

According to mother, had P.K. been afforded her right to "independent and competent" counsel, it is reasonably probable counsel would have established the sibling or parent-child relationship exception or, at minimum, protected sibling visitation. This conclusion is based upon her opinion that it is reasonably probable counsel for the older siblings would have raised deficiencies in the service of notice of the section 366.26 hearing, provided information to the court regarding the older siblings' views of what permanent plan was appropriate for P.K., and may have presented meaningful information regarding the sibling relationship exception.

18

a. *Mother lacks standing to raise issues concerning P.K.'s counsel*

Mother argues she had standing to argue the minors' attorney had a conflict of interest because it impacted her interests in the parent-child relationship. In support of her claim, she cites *In re Patricia E.*, a case in which a father appealed a juvenile court order continuing his daughter as a dependent of the court. (*In re Patricia E.* (1985) 174 Cal.App.3d 1, 4 (*Patricia E*).) There, the court appointed county counsel to represent both the child services agency and the dependent minor. (*Id.,* at p. 5.) The reviewing court held father had standing to argue the appointment was error, finding his interests and those of his daughter were interwoven, giving each of them standing to litigate issues having an impact on their shared interests. (*Id.,* at pp. 6-7.)

Mother's reliance on *Patricia E.* is misplaced. Not only was that case decided well before the issue of standing was addressed by our Supreme Court's 2011 opinion in *K.C., supra,* but the order appealed in *Patricia E.* was not one in which parental rights had been terminated. Rather, father was appealing a decision to keep the child in the dependency system instead of returning her to him. (*Patricia E., supra,* 174 Cal.App.3d at pp. 6-7.) It is well settled that parent and child have a critical protected interest in family preservation until reunification efforts cease; then the child's interest turns away from the parent and towards the achievement of permanence and stability, with adoption as the preferred permanent plan. (§ 366.26, subd. (b); *In re Marilyn H.* (1993) 5 Cal.4th 295, 309-310.)

As discussed *ante, K.C.* held that a parent's standing in an appeal from an order terminating parental rights is limited to litigating issues that would advance the parent's challenge to the terminating order. (*K.C., supra,* 52 Cal.4th at pp. 237-238.) Here, mother argues she was adversely impacted by counsel's simultaneous representation of her children because independent counsel would likely have taken steps to advance her interest in establishing the beneficial parent-child relationship and sibling relationship exceptions to terminating her parental rights. Mother did not undertake at the section 366.26 hearing to establish either of those exceptions and, therefore, her interests and rights were not affected in an immediate and substantial manner by counsel's representation of P.K. (*K.C., supra,* at p. 236.)

b. *Mother forfeited any opportunity to raise the conflict of interest claims*

Even if mother had standing to raise the question whether P.K.'s counsel had a conflict of interest, she has forfeited her right to argue it in this appeal. As she expressly contends in her opening brief, "an actual conflict was apparent at the inception of the case," apparently referring to the juvenile court's order on disposition continuing E.S. in her father's care where the Department had placed her when she was taken into protective custody. Even so she never voiced an objection before raising her concerns in this appeal.

Mother did not lack opportunity to object in the juvenile court. By the time of the section 366.26 hearing, E.S. had been placed with her father for 16 months with counsel's consent; counsel had submitted 10 months earlier on the Department's recommendation

to place the older siblings back in the home of their legal guardian/maternal grandmother; and, P.K. had been placed in the home of her maternal aunt with counsel's blessing for 10 months.

Mother acknowledges the issue has been forfeited but suggests we should exercise our discretion to excuse her failure to object, noting there is an exception to the forfeiture rule when the facts are not in dispute and the issue presented is purely a question of law. We confess our inability to locate the case she cites in support of that proposition (*In re V.F.* (2001) 87 Cal.App.4th 953), but we recognize our Supreme Court has acknowledged a reviewing court's discretion to excuse forfeiture in dependency cases. (*In re S.B.* (2004) 32 Cal.4th 1287, 1293-1294 (*S.B.*).) The Court cautions, however, that because dependency proceedings involve the well-being of children whose need for permanency and stability are of paramount importance, discretion must be exercised rarely and with special care, and be reserved for cases presenting an important legal issue. (*Ibid.*)

Unlike the case before us, the appeal in *S.B.* presented an important issue of law that reviewing courts were divided on, to wit, whether a juvenile court could delegate to the legal guardian the authority to decide if a parent could visit the child. (*S.B., supra,* 32 Cal.4th at pp. 1294-1295.) Here, contrary to mother's assertion, the issue whether counsel's simultaneous representation of P.K. and her siblings created an actual conflict such that the juvenile court was obligated to appoint separate counsel for P.K. is not an issue that can be sorted without consideration of the facts involved. (See, *Celine R., supra,* 31 Cal.4th at pp. 58-62.)

*c. If any error occurred on account of counsel's simultaneous*

*representation of P.K. and her siblings, it was harmless*

Even if mother had standing and had not forfeited the issue, and if counsel did have an actual conflict due to representing the children simultaneously, we would not reverse the order terminating parental rights. A juvenile court's error in not appointing separate counsel or relieving conflicted counsel will not result in setting aside an order unless there is a reasonable probability the outcome would have been different had the error not occurred. (*Celine R., supra,* 31 Cal.4th at p. 60.)

Here, mother declares, without explanation or factual support, that counsel's simultaneous representation "impacted" her interest in the parent-child relationship with P.K. She repeats her complaints concerning the separation of the children into different homes and inadequate efforts with respect to visitation over the course of the dependency, claiming they evidence the need for separate counsel. And she asserts "there is reason to believe the older children had relevant information" the court should have considered in determining P.K.'s best interests, but because counsel supported termination of parental rights only as to P.K., he could not have presented any evidence of a sibling relationship on behalf of the older children without betraying his duty to P.K. There is no reason to think counsel would have ignored any bond P.K. had with her siblings if he thought it possible her interests in maintaining those relationships outweighed the benefit to her of a permanent adoptive home.

In spite of mother's recognition in her opening brief that we indulge all legitimate inferences *in favor* of affirmance, mother thereafter declares, "[i]t is reasonable to infer that all four children maintained sibling bonds with each other" because they resided together when this case began. There is no doubt that mother, the maternal grandmother, P.K., and her siblings were together on November 25, 2019, when the Department took all the children into protective custody. But, that does not mean they had been living together, and mother does not provide a citation to the record for that proposition. Even if we were to embrace the inference mother tenders, sharing a home is not evidence of a sibling bond in the absence of other facts such as how long they lived together, whether they shared significant common experiences, shared confidences, and the like. (§ 366.26, subd. (c)(1)(B)(v); *In re L.Y.L.* (2002) 101 Cal.App.4th 942, 952.)

At bottom, there is nothing in the record to suggest the nature of P.K.'s relationship with any of her siblings was such that substantial interference with it would be so detrimental to her that continuing the relationship would outweigh the benefit to her of gaining a permanent home through adoption by her aunt. (§ 366.26, subd. (c)(1)(B)(v); *Celine R., supra,* 31 Cal.4th at pp. 60-61.) At the time of the section 366.26 hearing, she was only four years old. She was quite a bit younger than her older siblings (ages 8 and 9.5) who had been raised together. And, though P.K. had lived together with them in foster care from shortly after detention until the six-month review hearing, she had been separated from them for 10 months by the time of the section 366.26 hearing. After being placed with her maternal aunt, she was not exhibiting negative behaviors

23

(tantrums) as often. Her issues with severe separation anxiety continued, but she was developing trust of her aunt and becoming bonded to her, and was fearful and upset if her aunt was not where she could see her. In these circumstances, we see no reasonable probability that the court would have chosen a different permanent plan for P.K. even if it had relieved her counsel from representing all four children

5. *Mother's 909 motion*

A week or so after mother filed her opening brief, she filed a motion pursuant to section 909 of the Code of Civil Procedure requesting we take additional evidence described in the motion as "a responsive email from the children's attorney." We reserved our ruling.

The document offered by mother appears to be an email dated September 17, 2021 in response to a September 15 email from mother's appellate counsel, which is not provided. Mother admits the missive is not verified but posits it "appears to mother to be an accurate description of the case from [the children's attorney's] perspective." Mother's appellate counsel has not submitted a declaration in an effort to authenticate the document.

Counsel states the purpose in seeking introduction of the document is to "undermine the basis of the juvenile court's rulings and understandings that sibling visitation would continue [after termination of parental rights] and it has not."

The motion is denied. (*In re Zeth S.* (2003) 31 Cal.4th 396, 400, 413.)

24

6. *ICWA Compliance*

Mother argues the Department failed to comply with the provisions of subdivision (e)(2) of section 224.2 that require interviews of extended family members when the court or social worker has a reason to believe a child is an Indian child. We will find the Department's and juvenile court's compliance with ICWA and California's ICWA-implementing statutes and rules sufficiently deficient to call for a conditional reversal of the order terminating parental rights.

a. *Background: The ICWA inquiry and notice undertaken here*

Mother and the maternal grandmother were together on November 25, 2019, when the Department took all the children into protective custody. At that time, a social services practitioner interviewed mother and the maternal grandmother in person. Mother reported that P.K. and E.S. have no known Indian ancestry. The maternal grandmother reported that mother's other two children, M.K. and A.K., have no known Indian ancestry.

At the December 2, 2019 hearing on the detention of P.K. and E.S., the court noted it had "the ICWA inquiry form" from mother and father, which indicated mother "may" have Indian ancestry. Mother and father were ordered to complete a Family Information Sheet, which required them to disclose to the Department the names, residences, and other known identifying information for all of P.K.'s known maternal and paternal relatives. The sheets are not in the record.

Declarations of due diligence executed by a Department ICWA clerk were filed December 27, 2019 in the cases of P.K. and E.S. The clerk indicated some unspecified action had been taken on December 9 with respect to the BIA, the Eastern Band of Cherokee Indians, the Cherokee Nation of Oklahoma, and the United Keetoowah Band of Cherokee Indians, as well as to the children's parents. Thereafter, on December 12, ICWA notices on behalf of all four children were sent to the BIA, the three tribes, and the parents.

The tribes' responses to the notices had not been received by the time of the January 2020 contested hearing on jurisdiction and disposition on the section 300 petitions of P.K. and E.S, and the section 387 petitions of the older siblings. The court found the older siblings, who share the same biological parents as P.K., do not come under ICWA. It also found ICWA did not apply to E.S. because she was being placed with her father with provision of family maintenance services. As to P.K., however, it found ICWA "may" apply and that compliance with the notice requirements had been initiated.

In February 2020, the Department received responses from two of the three Cherokee tribes. The Eastern Band of Cherokee Indians reported that none of mother's four children were registered or eligible to register as a member of that tribe and, therefore, were not Indian children as defined by ICWA. The United Keetoowah Band of Cherokee Indians found none of the children met the tribe's requirements that they have a Certificate of Degree of Indian Blood evidencing at least one quarter of Keetoowah blood

26

and have direct ancestry to an individual listed on the 1949 Keetoowah Base Roll or the Dawes Roll (a federal list of individuals eligible for membership in one of five tribes, including the Cherokee tribes).  The record does not include a response from the Cherokee Nation, which had received notice of the children's dependency proceedings on December 23, 2019.

In response to the Department's inquiry in May 2020, the maternal grandmother revealed the name of her deceased paternal great-grandfather (the children's great-great-great-grandfather) and said he was Cherokee from the Wichita, Kansas area, but no other information about him was known.  The Department also discovered from an unspecified source the name of a deceased maternal great grandmother but noted no other information about her was available.

According to the Department's ICWA Declaration of Due Diligence filed on July 16, 2020, the additional information was added to what was provided in the December 2019 ICWA notices, and new notices were sent on July 10, 2020 to the three tribes, the BIA, mother, and the father.  The report attached copies of the certified mail receipts, but the signed return of those receipts and any responses from the tribes are not in the record.

The Department's report for the section 366.26 permanent plan selection hearing simply noted the court's finding that P.K. may come within ICWA, which was made during the January 2020 hearing on jurisdiction and disposition.  By the time it terminated parental rights, the court had not made a specific finding ICWA does not

apply to P.K.  In its form JV-320 written orders, however, the court did not select any of the several boxes provided on the form to indicate the child comes within the ICWA.

b. *ICWA:  Purpose and provisions for its implementation in juvenile dependency proceedings*

Congress enacted ICWA in 1978 to address the problem of abusive child welfare practices that had resulted in taking large numbers of Indian children from their families and tribes and housing them in foster or adoptive placements that were often non-Indian homes.  (25 U.S.C. §§ 1902, et seq.; *In re Isaiah W.* (2016) 1 Cal.5th 1, 7 (*Isaiah W.*).)

In order to protect the best interests of Indian children and promote the stability and security of Indian tribes and families, ICWA established minimum standards applicable to state court child custody proceedings involving Indian children, including juvenile dependency actions undertaken pursuant to section 300.  (25 U.S.C. §§ 1902, et seq.)  It also established the right of an Indian child, the parent or Indian custodian, and the Indian child's tribe to intervene in any proceeding for the foster care placement of, or termination of parental rights to, an Indian child.  (25 U.S.C. § 1911(c).)

To effectuate its purposes, ICWA requires a party seeking foster care placement of, or termination of parental rights to, an Indian child to notify the parent or Indian custodian and the Indian child's tribe of the pending proceedings by registered mail with return receipt requested, of their right to intervention.  (25 U.S.C. § 1912(a).)  If the identity or location of the parent, Indian custodian and tribe cannot be determined, then notice is to be given to the Secretary of the Interior, Bureau of Indian Affairs (BIA).

28

(25 U.S.C. §§ 1903(11), 1912(a).)  ICWA further provides that no foster care placement or termination of parental rights proceeding can take place until at least 10 days after receipt of notice by those entitled to it.  (25 U.S.C. § 1912(a).)

An "Indian child" is defined by ICWA as any unmarried person who is under age eighteen and is either (i) a member of an Indian tribe, or (ii) eligible for membership in an Indian tribe and is the biological child of a member of an Indian tribe.  (25 U.S.C. § 1903(4).)  An "Indian tribe" for the purposes of ICWA is a tribe or other organized group or community of Indians recognized as eligible to receive services provided by the Secretary of the Interior because of their status as Indians.  (25 U.S.C. § 1903(8).)

ICWA authorizes states to provide a higher standard of protection to the rights of a parent than those set forth in the Act.  (25 U.S.C. § 1921.)  The juvenile court must apply the higher standard whenever it applies.  (*Ibid.*; 25 C.F.R. 23.106(b); see § 224, subd. (d); *In re A.M.* (2020) 47 Cal.App.5th 303, 318 (*A.M.*).)

A critical component for the effectuation of ICWA in section 300 proceedings is the duty of inquiry set forth in the federal regulations (25 C.F.R. 23.107) and California's ICWA implementing statutes and rules (§ 224.2; rule 5.481(a)), which require the juvenile court and child services agency to take affirmative steps to assist in the identification of Indian children in section 300 cases.

To that end, whenever a California child services agency (such as the Department in this case) takes into protective custody a child who is described by section 300, it is required by section 224.2, subdivision (b) to ask the child, parents, extended family

29

members, and other relevant involved persons whether the child is, or may be, an Indian child. The agency must complete and attach to the petition an Indian Child Inquiry Attachment (form ICWA-010). (Rule 5.481(a)(1).)

When each party to the section 300 proceedings first appears in court, the court is required to ask if that party knows or has reason to know the child is an Indian child and to order the parents to complete Parental Notification of Indian Status (form ICWA-020). (§ 224.2, subd. (c); rule 5.481(a)(2)(c).) There are six circumstances that give rise to reasons to know a child is an Indian child, which are set forth in 25 C.F. R. § 23.107(c) (2019) and subdivision (d) of section 224.2.**2**

If the court or the agency's social worker knows or has reason to know that the subject of the dependency proceedings is an Indian child, the agency must notify by registered mail with return receipt requested the parent or Indian custodian and the Indian child's tribe or tribes of the pending proceedings and of their right to intervene. (§§ 224.2, subd. (f), 224.3, subd. (a)(1); 25 U.S.C. § 1912(a).) Notice is required to be given on Judicial Council form ICWA-030. (Rule 5.481(c)(1).) The agency must report in the form as much personal data (*e.g.*, names, birth dates, birth place, tribal enrollment

---

**2** Those circumstance are: (i) a person having an interest in the child informs the court that the child is an Indian child; (ii) the residence or domicile of the child, the child's parents, or Indian custodian is on a reservation or in an Alaska Native village; (iii) the court is informed by any participant in the proceeding, officer of the court, Indian tribe, Indian organization, or agency that it has discovered information indicating that the child is an Indian child; (iv) the child who is the subject of the proceeding gives the court reason to know that the child is an Indian child; (v) the court is informed that the child is or has been a ward of a tribal court; and, (vi) the court is informed that either parent or the child possess an identification card indicating membership or citizenship in an Indian tribe.

information) as the agency knows about the child's biological parents, grandparents, and great-parents.  (§ 224.3, subd. (a)(5); 25 C.F.R. 23.111.)

If the court or social worker does not have a reason to know but has reason to believe a child is an Indian child, then they should as soon as practicable make further inquiry regarding the possible status of the child, including interviewing extended family members.  (§ 224.2, subd. (e)(2).)  A reason to believe exists if the court or the social worker has information suggesting that either the parent of the child or the child is a member, or eligible for membership, in an Indian tribe.  (*Ibid.*)  Information suggesting membership or eligibility for membership includes information that indicates, but does not establish, the existence of one or more of the grounds for reason to know set forth in section 224.2, subdivision (d), *ante*.  (*Ibid.*)

A parent does not forfeit a claim of violation of the ICWA inquiry or notice violation by failure to raise it in the juvenile court because the termination order necessarily subsumed a present determination of the issue of ICWA's inapplicability. (*Isaiah W., supra*, 1 Cal.5th at p. 15.)

We review the issue of compliance with the ICWA inquiry requirements for substantial evidence.  (*In re D.F.* (2020) 55 Cal.App.5th 558, 565 (D.F.).)  A violation of any state provision that gives greater protection beyond what ICWA requires is harmless error unless the appellant can show a reasonable probability that he or she would have obtained a more favorable result in the absence of the error.  (*A.M., supra,* 47 Cal.App.5th at p. 318.)

31

c. *The preliminary question: what triggers the duty of inquiry?*

Before addressing the issues of ICWA compliance deficiencies in this case, we dispose of the Department's argument that no ICWA error occurred here because mother's response on the ICWA inquiry form did not trigger the need to conduct further inquiry.

The Department posits subdivision (e) of 224.2 imposes a duty to make further inquiries only if there is reason to believe a child is an Indian child, so even if its further inquiry efforts were inadequate in this case, any shortcomings were harmless. Relying on *In re Austin J.*, it argues mother's claim she "may" have Indian ancestry does not provide a reason to believe P.K. is an Indian child and, therefore, it was not obligated to make any further inquiry. (*In re Austin J*. (2020) 47 Cal.App.5th 870, 885 (*Austin J*).)

In *Austin J*., the mother, like mother in this case, said she "may" have Cherokee ancestry. (*Austin J., supra,* 47 Cal.App.5th at p. 885.) Division One of the Second District found the statement suggests only a mere possibility of Indian ancestry and does not call for further inquiry because it does not establish a reason to believe either that the child is a member of a tribe or that the child is eligible for membership. (*Ibid*.)

We have joined other courts of appeal in rejecting *Austin J.*'s conclusion because we find it not only contrary to well-established principles of ICWA law but that it also fails to take into account the essential role further inquiry plays in enforcing the court's and children's services agency's affirmative and continuing duty imposed by section 224.2, subdivision (a) to inquire about a child's status as an Indian child. (*In re Josiah T.*

32

(2021) 71 Cal.App.5th 388, 404-405 (DCA 2/8) [further inquiry required when paternal grandmother disclosed and later denied Cherokee ancestry]; *In re A.M., supra,* 47 Cal.App.5th at pp. 322-323 (DCA 4/2) [mother told she may have ancestry in specified tribes and her grandfather also had possible Indian heritage]; *In re S.R.* (2021) 64 Cal.App.5th 303, 310, 316-317 (DCA 4/2) [further inquiry required when parents deny but grandparents later claim Indian ancestry]; *D.F., supra,* 55 Cal.App.5th at pp. 568-569 (DCA 2/8) [further inquiry required where mother may have Indian ancestry from an unknown tribe name from New Mexico]; *In re T.G.* (2020) 58 Cal.App.5th 275, 292-297 (DCA 2/7) (*T.G.*) [further inquiry required when mother believes she has Cherokee ancestry through maternal ancestors and possible Indian ancestry through her paternal grandfather].)

> ### d. The Department's and juvenile court's compliance with the inquiry and notice requirements was deficient in important respects

Mother argues this court should reverse the order terminating her parental rights and remand the matter to comply with the ICWA inquiry and notice requirements. In part, her argument is bottomed on the claim that the Department's initial notice served in December 2019 failed to include information mother asserts should have been obtained, or was obtained and not included on the notice forms, resulting in no-ICWA responses from the tribes based on incomplete information.

We need not address mother's complaints concerning the December notice. The duty of inquiry is ongoing and because information obtained by the Department later in

33

the proceedings required service of updated notices to the tribes, the December notices were superseded, effectually voiding the tribes' responses to them.

### (1.) *The Department's inquiry efforts were lacking*

It appears the Department did engage in some further inquiry efforts after serving its first notice to the tribes in December 2019. In May 2020, maternal grandmother provided the name of her deceased paternal great-grandfather, Robert J., a Cherokee Indian from the Wichita, Kansas area. The record also establishes that, by July 2020, the Department knew maternal grandmother's birthdate and the name of one of P.K.'s maternal great-grandmothers, Marie P. It did not, however, speak to the maternal aunt who, contrary to mother's claim, is not reasonably likely to share the same parents with the maternal grandmother.[3] She does, however, appear to be an extended family member who may have knowledge concerning lineal family members. There is no indication in the Department's ICWA Declarations of Due Diligence or in other of its reports that it complied with section 224.2 by asking the maternal aunt if she had biographical information concerning P.K.'s lineal ancestors.

The juvenile court and the Department have an affirmative and continuing duty to ask about a child's status as an Indian child. (§ 224.2, subd. (a); *T.G.*, *supra*, 58

---

[3] It is unlikely maternal grandmother, born in 1948, is the sister of maternal aunt (Mrs. M), who born was in 1972. Although Mrs. M is described throughout the record as the child's maternal aunt, the Department's section 366.26 report reveals Mrs. M was an only child biologically speaking until her late teens, although her parents did foster other children. In her teenage years, her parents separated. When her mother later remarried, Mrs. M gained three stepsiblings and a half-sister; the half-sister is necessarily younger than maternal grandmother. It thus evident Mrs. M occupies the role of an aunt, but she does not appear to have lineal heritage of maternal grandmother or mother.

Cal.App.5th at p. 290.)  They apparently had not yet fulfilled that duty by the time the juvenile court terminated P.K.'s parental rights because after the six-month review, there is nothing in the Department's reports up to and including the section 366.26 hearing indicating it had asked the maternal aunt if she had any information about P.K.'s biological ancestors.  Nor is there any indication the juvenile court made any inquiries concerning ICWA compliance at any time after the six-month review, including during the hearing resulting in termination of parental rights.

(2.)  *The lack of evidence demonstrating the tribes' receipt of*

*amended notices in July 2020, or of service of any notices thereafter*

If after a tribe has determined a child is not an Indian child, the court or social worker discovers any biographical information concerning lineal ancestors that was not available or included in the prior notice, the Department is required to provide the additional data to the tribes and the BIA.  (§§ 224.2, subd. (j); 224.3, subd. (a)(5).)

When the Department prepared notices of the July 2020 six-month review of P.K.'s case and those of the older siblings, it filled out new ICWA notices setting forth the details included in the December 2019 notice and added maternal grandmother's birthdate and the names of Marie P. and Robert J., and included a notation that Robert was a Cherokee Indian from the Wichita, Kansas area.

The Department's certificates of service reflect the notices were mailed on July 10, 2020 using certified mail with return receipts requested as required to the three Cherokee tribes, the BIA, and the children's parents.  (§§ 224.2, subd. (f), 224.3, subd.

35

(a)(1); 25 U.S.C. § 1912(a).) The record contains copies of the notices, which the Department was required to file, but there are no return receipts evidencing delivery of the notices or any responses from any of the tribes to the July notice, which are also required to be filed with the court in advance of the hearing. (§ 224.3, subd. (c).)

By the time of the May 2021 section 366.26 permanent plan selection hearing, no determination of P.K.'s ICWA status had been made based upon the additional information the Department had obtained in July 2020. Department was therefore required to provide notice of the hearing to the tribes, and to attach an ICWA notice form that included maternal grandmother's birth date and the information about Marie P. and Robert J. (§ 224.3, subds. (a), (b).) It did not do so.

In short, when the section 366.26 hearing took place, the Department had not completed the ICWA inquiry and notice requirements, including the requirement it give notice of the hearing to the tribes with a completed ICWA notice form attached. The juvenile court did not fulfill its duty to inquire about ICWA compliance at the hearing. Accordingly, the juvenile court erred when it proceeded to terminate the parental rights of P.K. without resolution of her Indian child status; it compounded that error when it included findings in its written orders on the section 366.26 that P.K. is not an Indian child. In the circumstances, a limited reversal of an order terminating parental rights is appropriate. (*T.G., supra,* 58 Cal.App.5th at p. 292.)

The purpose of termination of parental rights is to free a child for adoption. (Rule 5.725(a).) Because the reinstatement of mother's parental rights precludes the child's

36

adoption at this time, the reinstatement of father's parental rights pending resolution of the ICWA inquiry and notices issues is in P.K.'s best interests. (*In re Mary G.* (2007) 151 Cal.App.4th 184, 208.)

## DISPOSITION

The order terminating the rights of P.K.'s parents is conditionally reversed and the matter is remanded to the juvenile court with directions to reappoint counsel for the parents and to comply with the inquiry and notice provisions of ICWA, sections 224.2 and 224.3, and California Rules of Court. The court is to direct the Department to comply with those provisions by fully investigating the child's maternal lineal ancestry, to include any additional information it discovers from that further inquiry along with the information set forth in the notice prepared in July 2020, and serve the completed notices as required by sections 224.2 and 224.3.

If the tribes and the BIA do not respond, or the Department receives responses that P.K. is not an Indian child, the juvenile court must immediately reinstate the order terminating parental rights. If, however, any tribe or the BIA determines the P.K. is an Indian child, the juvenile court must conduct a new section 366.26 permanent plan

selection hearing in accordance with ICWA and California's applicable ICWA-implementing statutes and rules.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

RAMIREZ
P. J.

We concur:

CODRINGTON
J.

FIELDS
J.